239 F.3d 508 (2nd Cir. 2001)
 POWERSERVE INTERNATIONAL, INC., Plaintiff-Appellee,
v.
EDWARD M. LAVI and EDMOND J. LAVI, individually, as partners of and d/b/a The Continental Group, and TONY ZAR, Defendants,
PETER LAVI, a/k/a Parviz Lavi, and OMEGA INDUSTRIES & DEVELOPMENT CORP., Defendants-Appellants.
 Docket No. 00-7438
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued November 6, 2000
Decided February 13, 2001
Errata Filed February 27, 2001
 
 Appeal from a default judgment entered in the United States District Court for the Eastern District of New York, Thomas C. Platt, Judge, awarding plaintiff damages of $740,000, plus interest totaling $287,321.79, on contract and fraud claims.
 Affirmed.
 ARTHUR D. RUSSELL, New York, New York (John I. Karesh, Marlene D. Hall, Feltman, Karesh, Major & Farbman, New York, New York, on the brief), for Plaintiff-Appellee.
 ROBERT M. CALICA, Garden City, New York (Edward M. Ross, Rosenberg Calica & Birney, Garden City, New York, on the brief), for Defendants-Appellants.
 Before: KEARSE, McLAUGHLIN, and STRAUB, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Peter Lavi a/k/a Parviz Lavi ("Lavi" or "Parviz Lavi") and Omega Industries & Development Corp. ("Omega") appeal from an amended default judgment, entered as a final judgment pursuant to Fed. R. Civ. P. 54(b), of the United States District Court for the Eastern District of New York, Thomas C. Platt, Judge, ordering them to pay plaintiff Powerserve International, Inc. ("Powerserve"), $740,000 in damages, plus interest totaling $287,321.79, following the failures of Lavi and Omega (a) to comply with orders of the court to obtain counsel, occasioning the entry of defaults against them, and (b) to post a $500,000 bond in order to have the court vacate the defaults. On appeal, Lavi and Omega contend principally that the district court erred in entering the defaults and in requiring them to post a bond as a condition of vacating the defaults. Finding no merit in their contentions, we affirm.
 
 I. BACKGROUND
 
 2
 According to the first amended and supplemental complaint ("complaint"), Powerserve, whose business is refurbishing and selling gas turbines and related items, was contacted by defendant Tony Zar as an agent for defendants Continental Group ("Continental"), Omega, and/or Lavi, offering to sell a gas turbine rotor. In September 1995, Powerserve agreed to purchase a gas turbine rotor, bearing a specific serial number, for $740,000; the purchase was subject to Powerserve's inspection and acceptance, but Powerserve agreed to make payment of the purchase price within 24 hours of delivery. Defendants warranted, inter alia, that the rotor would be fit for the purposes for which Powerserve purchased it and that if the rotor did not comply with the warranties, the vendor at its own cost would provide replacement or repair.
 
 
 3
 Thereafter, a rotor was delivered, and Powerserve paid the purchase price; upon inspection, however, it discovered that the rotor (a) was defective and unusable, and (b) bore a different serial number than that specified in the contract and hence was not the rotor Powerserve had agreed to buy. Powerserve revoked its acceptance of the rotor and demanded immediate repayment. Defendants neither reimbursed Powerserve nor gave it instructions for the rotor's return or disposition.
 
 
 4
 Powerserve commenced the present action in November 1996. As amended, the complaint asserts claims of, inter alia, breach of contract, breach of warranty, and fraud, and seeks damages of $740,000, plus interest and storage expenses. In addition to the above events, it alleges that at some point, defendants had replaced the entity originally identified by Zar as the rotor's owner with Continental, which is believed to lack sufficient assets to satisfy a judgment with respect to the nonconforming and defective rotor. Edward M. Lavi ("Edward") and Edmond J. Lavi ("Edmond"), Lavi's sons who are partners in Continental, were added to the action as defendants in 1998.
 
 
 5
 In their answers, defendants admit that Powerserve purchased and paid for a rotor and that defendants refused to refund the purchase price. As affirmative defenses, they allege, inter alia, that the sale was on an "as is" basis, that Powerserve's rejection of the rotor was untimely, and that the defendants other than Continental are not proper parties to the action.
 
 
 6
 A. The Parade of Defense Attorneys and the Entry of Defaults
 
 
 7
 Defendants were initially represented by the firm of Spilky & Spilky ("Spilky firm"). In January 1998, that firm moved to be relieved on the ground, inter alia, that defendants had failed to pay fees in connection with the defense. The district court allowed the Spilky firm to withdraw and gave defendants four weeks to obtain new counsel. It stated that if new counsel were not obtained within that time, the court would permit Powerserve to move for a default judgment. In February 1998, defendants indicated that Tompkins & Kokkoris would represent them; Tompkins & Kokkoris did not enter its appearance, however, until April 1998.
 
 
 8
 In November 1998, Tompkins & Kokkoris moved to withdraw from representing all defendants on the ground, inter alia, of defendants' failure to pay fees. The district court held the motion in abeyance, ordering the firm to inform its clients of the motion to withdraw and to appear with the clients at a conference on December 11 ("December 1998 Conference"). At the December 1998 Conference, all counsel appeared; Zar, Edward, and Edmond appeared personally (a new law firm entered an appearance for Edward and Edmond in January 1999; Zar continues pro se). Lavi did not appear at the December 1998 Conference. His daughter Angella Lavi Mottahedeh attended and stated that Lavi was unable to attend because he was incarcerated on an unrelated matter.
 
 
 9
 The court granted Tompkins & Kokkoris's motion to withdraw with respect to all of the individual defendants; it reserved decision as to Omega, pending the parties' attempt to settle the case. The court gave Lavi and Omega four weeks to negotiate a settlement or retain new counsel; it informed Mottahedeh that if there were no settlement and no retention of new counsel, the court would permit Powerserve to file a motion for a default judgment.
 
 
 10
 On January 8, 1999, another conference ("January 1999 Conference") was held. The case had not been settled, and Mottahedeh reported that neither Omega nor Lavi had obtained new counsel. The district court granted Tompkins & Kokkoris's motion to be relieved as counsel for Omega. Mottahedeh attempted, pursuant to a power of attorney, to represent Lavi. The district court rejected her attempt as she was not an attorney. Mottahedeh then requested an extension of time to obtain counsel for her father and Omega; the district court denied her request. In accordance with its warning at the December 1998 Conference, the court authorized Powerserve to move for a default judgment against Lavi and Omega. It set a January 29, 1999 deadline for the filing of the motion and a March 1, 1999 deadline for the submission of opposition papers.
 
 
 11
 On March 11, 1999, in accordance with Fed. R. Civ. P. 55(a), the district court clerk entered the defaults of Lavi and Omega. The default certification noted, inter alia, that Lavi and Omega, having been granted until January 8, 1999, to obtain legal representation, and having advised the court on that date that Lavi could not appear in person and that no attorney had been obtained for either defendant, "Parviz Lavi was in default for not appearing in person or by an attorney as directed by the Court" and "Omega is also in default for not appearing by an attorney as directed by the Court," Clerk's Certificate entered March 11, 1999, ¶3(c).
 
 
 12
 In the meantime, Powerserve timely moved for a default judgment. In addition to recounting the course of the litigation and noting that discovery had been impeded by the repeated withdrawals of counsel, each of which had asserted a lien on defendants' files, Powerserve argued that the delays imperiled its collection of an eventual judgment against Lavi and Omega because of collusive conveyances. In support of its contentions, Powerserve's counsel submitted an affidavit stating, inter alia, that discovery had revealed that in May 1998, a judgment for more than $1 million had been obtained against Lavi and Omega by Lavi's brother, and that during the past several years
 
 
 13
 Parviz Lavi ha[d] wire transferred substantial sums of money in excess of $100,000 to his son Edmond Lavi... and... when such funds were needed by Parviz Lavi, Edward Lavi wire-transferred those funds to accounts of Parviz Lavi's daughter, Angela [sic] Mottahedeh for Parviz Lavi's use.
 
 
 14
 (Affidavit of Michael R. Klekman dated January 22, 1999, ¶14.) Thus, Powerserve noted that though "Parviz Lavi is the real or beneficial owner of several properties in New York and California[,]... there is a danger of transfer of those properties and assets out of the reach of judgment creditors." (Id.)
 
 
 15
 Lavi and Omega did not file opposing papers by the March1 deadline. On March 10, a third firm, Reisman, Peirez, Reisman & Calica wrote to the court seeking permission to appear as counsel for Lavi/Omega and to cross-move under Fed. R. Civ. P. 6(b) for a nunc pro tunc enlargement of time within which to oppose Powerserve's motion for a default judgment.
 
 
 16
 B. The Rulings on the Default-Related Motions
 
 
 17
 In a Memorandum and Order dated July 21, 1999 ("July 1999 Order"), the district court denied without prejudice Powerserve's motion for a default judgment, granted leave for the new law firm to appear and represent Lavi and Omega, and conditionally granted the motion of Lavi and Omega for an extension of time to oppose the motion. The court indicated that it would be inclined to vacate the defaults because it found "no clear evidence of wilful disregard" of its orders but "merely the admittedly lax efforts of a non-party, non-attorney to obtain counsel for a corporation and incarcerated person," and because the delays in complying with the court's order to obtain counsel three months by Lavi, two by Omega had not unduly prejudiced Powerserve, given that new "counsel stands ready (albeit belatedly) to defend." July 1999 Order at 9. Nonetheless the court was "troubled by the rate of attrition among defendants' lawyers in this case, the delays occasioned by Ms. Mottahedeh's laxity and by the retaining lien, and by the allegations regarding defendants' actual and potential transfers of assets." Id. at 10. Accordingly, the court made its grant of additional time for Lavi and Omega to oppose Powerserve's motion contingent on their satisfaction of several conditions, including that they pay "reasonable costs and attorneys' fees of plaintiff's counsel from 11 December 1998 to date," and that they post with this Court, within ten (10) days of the date of this Order, a bond signed by a reputable insurer in the amount of $500,000 to secure against any further transfers pending the outcome of this case.
 
 
 18
 Id. at 11. The court warned that "[i]f all the[] conditions are not met within the times prescribed therefor, a Default Judgment will be entered against Parviz Lavi and Omega." Id.
 
 
 19
 Lavi and Omega moved for reconsideration of the condition that they post a bond. Their attorney submitted an affidavit stating that a declaration would be forthcoming in which "Mr. Lavi will aver that he does not have the funds or resources available to post or collateralize a $500,000 undertaking," and "that as an incarcerated defendant, he is scarcely in a position in a civil case to perform the types of business steps which would be necessary to provide such an undertaking under any circumstances." (Affidavit of Robert M. Calica dated July 29, 1999, ¶9.) Thereafter, Lavi submitted a declaration stating:
 
 
 20
 I affirm that I am unable to comply with the third condition imposed by this Court's order, i.e., that I post a $500,000 undertaking with the Court in order to defend myself and Omega against the merits of Powerserve's claims against us. I have neither the financial resources nor the ability to do so while imprisoned.
 
 
 21
 (Declaration of Parviz Lavi dated July 31, 1999 ("Lavi Declaration"), ¶5.) The Lavi Declaration said nothing further about the financial status of Lavi or Omega. Lavi also submitted a pro se unsworn and unsigned letter to the district court purporting to be "for Omega Industries and Development Corp." (Letter of Parviz Lavi dated August 2, 1999 ("Lavi Letter"), at3), stating that "due to Omega's actual financial situation posting $500,000 bond is impossible at this time" (id. at 1). The letter, like the Lavi Declaration, provided no information as to why the posting of a bond was not feasible. Instead, the Lavi Letter accused Powerserve of trying to put Omega out of business and requested that the court dismiss Powerserve's claims and order Powerserve to pay Omega $1.5 million in punitive and exemplary damages.
 
 
 22
 Powerserve opposed elimination of the bond requirement and submitted, inter alia, copies of Lavi's income tax returns and a statement of Lavi's financial condition as of the end of May 1998. The latter, while indicating a negative net worth because Lavi owed back taxes, showed assets totaling some $5.325 million, including real estate valued at more than $2.6 million. Thus, Powerserve argued that
 
 
 23
 based upon Parviz Lavi's own documents, he has far more than sufficient assets to obtain a bond in the amount required by the Court, unless he has recently transferred such assets without fair consideration, in which event the condition imposed by the Court is critical to avoiding undue prejudice to Powerserve.
 
 
 24
 (Powerserve Memorandum of Law in Opposition to Motion for Reconsideration or Reargument at 3.) Lavi and Omega did not submit a reply.
 
 
 25
 In a Memorandum and Order dated September 1, 1999 ("September 1999 Order"), the district court denied the motion for reconsideration of the bond requirement. After considering Lavi's assertions of his and Omega's financial inability to pay for a bond, the court stated that
 
 
 26
 (1) Defendants have failed to submit any documentation or financial information which would support the allegation of financial inability to comply with the Court's bond requirement.
 
 
 27
 (2) Defendants have failed to set forth what, if any, efforts they have made to obtain the bond.
 
 
 28
 (3) Defendants' documents, submitted by plaintiffs, reveal adequate assets to post the bond, to wit:
 
 
 29
 (a) financial statement of May [31], 1998 showing assets of $5,325,000 with real estate worth $2,610,000 including [four properties ranging in value from $247,000 to more than $800,000, plus a house in Santa Monica, California].
 
 
 30
 If, for example, one or more or all of these property interests had recently been sold, foreclosed upon, etc., documents which demonstrated that fact would be readily available. No such documents have been forwarded by defendants.
 
 
 31
 (4) Defendants have never submitted an affidavit of merits signed and sworn to by the person(s) having first-hand knowledge of the facts.
 
 
 32
 September 1999 Order at 3-4. See also id. at 4 fn. ("Lavi... letter dated August 2.... does not add any substantive support to defendants' assertion that they are unable to post the required bond.")
 
 
 33
 Lavi and Omega did not post a bond. On September 13, the district court entered a default judgment against them for $740,000 plus interest. An amended default judgment was entered on March 28, 2000, requiring Lavi and Omega to pay Powerserve a total of $1,027,321.79 including interest, and containing a certification pursuant to Fed. R. Civ. P. 54(b) that the judgment was final. This appeal followed.
 
 II. DISCUSSION
 
 34
 On appeal, Lavi and Omega contend principally that the district court erred (1) in entering defaults against them, and (2) in imposing the condition that they post a bond--an "impossible" condition because Lavi was incarcerated--in order to have the defaults vacated. Finding no merit in their contentions, we affirm.
 
 A. Entry of Default and Default Judgment
 
 35
 Rule 55(a) of the Federal Rules of Civil Procedure provides that
 
 
 36
 [w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise,the clerk shall enter the party's default.
 
 
 37
 Fed. R. Civ. P. 55(a). Under Rule 55(c), "the court may set aside an entry of default" "[f]or good cause shown." Fed. R. Civ. P. 55(c).
 
 
 38
 In determining whether to set aside a party's default, the district court should consider principally "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993). Because there is a "preference for resolving disputes on the merits," doubts "should be resolved in favor of the defaulting party." Id. at 95, 96. Ultimately, the matter of whether to grant relief from the entry of a default is
 
 
 39
 left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties.
 
 
 40
 Id. at 95. We will not reverse the denial of such a motion except for abuse of discretion. See, e.g., id.; American Alliance Insurance Co. v. Eagle Insurance Co., 92 F.3d 57, 62 (2d Cir. 1996); Davis v. Musler, 713 F.2d 907, 912 (2d Cir. 1983).
 
 
 41
 In challenging the defaults entered in the present case, Lavi and Omega repeatedly suggest that they were not in default because, after the order permitting their second set of attorneys to withdraw, Lavi appeared "through his pro se daughter" acting "as attorney-in-fact." (Lavi/Omega brief on appeal at 11; id. at 12.) The suggestion that Mottahedeh could represent Lavi and Omega is, however, contrary to the principles that an individual may not be represented in court by another person who is not an attorney, see, e.g., 28 U.S.C. §1654 (an individual may conduct his "own case[] personally or by counsel"); Iannaccone v. Law, 142 F.3d 553, 558 (2d Cir. 1998) ("because pro se means to appear for one's self, a person may not appear on another person's behalf in the other's cause"), and that a corporation may not be represented by a person who is not an attorney, see, e.g., Pridgen v. Andresen, 113 F.3d 391, 393 (2d Cir. 1997) ("a layperson may not represent a corporation"). Mottahedeh was not an attorney and hence could not be allowed to represent Lavi or Omega in litigation.
 
 
 42
 In addition, Lavi and Omega contend that "[n]o declaration of default was warranted" (Lavi/Omega brief on appeal at 12) given that they obtained new counsel "barely two months" after the court's deadline and two days before the default motion was to be argued, that Powerserve had not moved for summary judgment, that discovery had been completed, and that it had been difficult to obtain counsel both because Lavi was incarcerated and unable to be of significant assistance and because prior counsel had filed retaining liens on defendants' files. These arguments in effect concede that Lavi and Omega were in default; and while the court was free to consider these facts as extenuating circumstances in ruling on the motion to vacate the default, the record was clear that Lavi and Omega, not having obtained counsel as ordered by the time of the January 1999 conference (and having filed no papers in opposition to the default motion by the court's March 1 deadline), were in default. The court clerk therefore properly entered the default.
 
 B. The Challenge to the Bond Condition
 
 43
 The principal arguments advanced by Lavi and Omega are that it was impermissible for the district court to condition vacatur of the default on their posting a $500,000 bond because the court did not find their default to have been willful and because satisfaction of the bond condition was impossible. Neither contention has merit.
 
 
 44
 Preliminarily, we note that, while Lavi and Omega argue principally that the bond condition was an abuse of discretion, one paragraph of their brief on appeal asserts that as a matter of law the district court had no authority to impose a bond prior to a final adjudication of the merits of the case because a "District Court lacks 'power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed'" (Lavi/Omega brief on appeal at 18 (quoting Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 310 (1999) (emphasis in brief))). Their reliance on Grupo Mexicano is misplaced. That case involved a creditor's request for a preliminary injunction freezing certain of the defendant's assets. The bond condition imposed here is not an injunction, see, e.g., MacEwen Petroleum, Inc. v. Tarbell, 136 F.3d 263, 264 (2d Cir. 1998), and it did not impose a restraint on the alienation of any of defendants' property; it merely required Lavi and Omega, as a condition for vacating the defaults, either to hypothecate some of their assets or to purchase a bond, in order to assure that at least a portion of any judgment recovered by Powerserve would be satisfied. Further, at oral argument of this appeal, there appeared to be no dispute that a bond of the type ordered in this case would typically require a payment of one percent of the bond's face amount, here just $5,000. Plainly no asset freeze of the type at issue in Grupo Mexicano was ordered here.
 
 
 45
 In determining whether to exercise its discretion to set aside a default, see Part II.A. above, a district court has inherent power to impose a reasonable condition on the vacatur in order to avoid undue prejudice to the opposing party. "Opening a default may prejudice a litigant in a number of ways," including by "provid[ing] greater opportunity for fraud and collusion." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure §2699, at 169 (1998). "The imposition of conditions as part of granting a Rule 55(c) motion can be used to rectify any prejudice suffered by the nondefaulting party as a result of the default and the subsequent reopening of the litigation." Id. §2700, at 170-71.
 
 
 46
 Accordingly, a number of circuits have approved of conditioning the vacatur of defaults or default judgments on the posting of security for payment of all or part of an eventual adjudicated judgment. See, e.g., Philips Medical Systems International B.V. v. Bruetman, 8 F.3d 600, 602-04 (7th Cir. 1993) (affirming $19 million default judgment after district court refused vacatur because of the defendant's failure to comply with condition that he deposit with the court more than $800,000 to secure partial satisfaction of the judgment in the event the plaintiff prevailed); Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec, 854 F.2d 1538, 1546-47 (9th Cir. 1988) (approving district court's conditioning of vacatur on, inter alia, defendant's payment of plaintiff's attorneys' fees, and commenting that "[i]n some cases, it may also be appropriate for the defendant to be required to post bond to secure the amount of the default judgment pending a trial on the merits"); Thorpe v. Thorpe, 364 F.2d 692, 694 (D.C. Cir. 1966) (questioning the justification for the district court's requirement of a bond in an amount greater than the amount of the default judgment, but stating that "[i]t may... be appropriate, in some cases, for the defendant to be required to post bond to secure the amount of the default judgment pending trial on the merits"). This Court itself, in reversing a district court's refusal to vacate a default judgment, has ordered, when it seemed necessary to protect the plaintiff's rights, that the default judgment be vacated only "on the condition that [the defendant] post a bond covering the amount claimed by [the plaintiff], including interest." First Fidelity Bank, N.A. v. Government of Antigua & Barbuda Permanent Mission, 877 F.2d 189, 196 (2d Cir. 1989).
 
 
 47
 Not every case will warrant conditioning vacatur on the posting of such a substantial bond. Whether there is justification for such a condition will depend on the circumstances of the case, and it is incumbent on the district court to make findings sufficient to permit appellate review of the condition's reasonableness.
 
 
 48
 In the present case, the district court in its July 1999 Order discussed the factors relevant to a determination of whether to vacate a default, resolved doubts as to willfulness in favor of Lavi and Omega, and expressly noted the concerns that led it to make the vacatur conditional. Those concerns were principally the delays caused by Lavi and Omega and the potential for a contrived unenforceability of an eventual judgment in favor of Powerserve. The court noted, inter alia, that two law firms had withdrawn from representing Lavi and Omega because of nonpayment of their bills; and it noted that the retaining lien asserted by the Spilky firm had apparently been resolved by a stipulation calling for Lavi and Omega to post a bond in the amount of $40,000 for that firm's fees, but that that bond had not been posted. The court also referred to the evidence that Lavi had ostensibly made large cash payments to his son Edmond, only to retain the use of that money via transfers from Edmond to Lavi's other son Edward, and then from Edward to Lavi's daughter Mottahedeh for the use of Lavi. And the court referred to the evidence that a more than $1.1 million judgment had recently been obtained against Lavi and Omega by Lavi's brother. The district court's expressions of concern based on this evidence of "defendants' actual and potential transfers of assets," July Order at 10, are ample to permit appellate review of the justification for the bond condition.
 
 
 49
 Powerserve's descriptions of those events, presenting ample cause for concern, were apparently undisputed. The evidence of the Lavi family's circuitous wire transfers of moneys originating with Lavi and ultimately being used for Lavi, along with the large judgment obtained against Lavi and Omega by Lavi's brother, was aired at least as early as January 1999 in Powerserve's motion for a default judgment. The record does not indicate that Lavi or Omega ever offered any explanation of these events or any information to dispel the impression that the transfers and payments were collusive efforts to place their assets beyond the reach of judgment creditors. The district court's concern that Lavi and Omega might make additional transfers without fair consideration in order to prevent Powerserve from collecting a judgment was well grounded in the record, and the bond condition, imposed to allay that concern, was a reasonable one.
 
 
 50
 Lavi and Omega presented nothing to alleviate that concern in support of their motion to eliminate the bond condition. Further, their protestations of inability to post a bond were entirely conclusory. Although Lavi stated that he was "unable to comply with the [bond] condition" because he lacked "the financial resources" (Lavi Declaration ¶5), and that "due to Omega's actual financial situation posting $500,000 bond is impossible at this time" (Lavi Letter at 1), he provided no elaboration or explanation and proffered not a shred of evidence to support his assertions. In contrast, in response to those assertions, Powerserve presented documentary evidence showing that Lavi's assets totaled more than $5 million. Lavi and Omega presented nothing in reply to dispute that demonstration or to show that a $5,000 bond premium was beyond their means.
 
 
 51
 In all the circumstances, given the evidence presented by Powerserve, we see no abuse of discretion in either the district court's imposition of the bond condition or its refusal to lift that condition in order to relieve Lavi and Omega of their defaults.
 
 CONCLUSION
 
 52
 We have considered all of appellants' arguments on this appeal and have found them to be without merit. The judgment is affirmed.